Good afternoon, Steve Hitchcock on behalf of the defendant's appellants in this case, which includes the City of Flint and its emergency manager. And I would like to reserve four minutes for a possible reply to other counsel's arguments. That is fine, and you may proceed. There shouldn't be any dispute in this case that the Michigan legislature, in adopting Public Act IV, was addressing a legitimate public concern of the financial integrity of the municipalities within its state. And I think that certainly there shouldn't be any doubt that the City of Flint was in problems based on all the factors that we've laid out in the brief, substantially declining revenues, substantially declining populations, and an ever-increasing larger piece of their general fund that was committed to retiree health care. Is there any dispute as to whether these collective bargaining agreements, some of which I know have been, quote-unquote, expired or modified over time, any dispute as to whether the agreements provided for lifetime health care coverage for retirees? I'm not disputing that the contracts provided for some lifetime health care benefits, but not a specific set of benefits. But let me . . . do you dispute that they had a contractual right and that this case is about using the emergency manager powers to modify contracts as opposed to any right that you would have to modify the contract were you not proceeding under the emergency manager? Well, I don't admit that there wouldn't have been a right to proceed without the Emergency Manager Act to change the health care coverage of the retirees. In this case, because he was emergency manager, because he had the Act, he chose to use that as an avenue to . . . Okay, but we are . . . she had the same question, and I think it's a preliminary question, that this case is not about a municipality's . . . this case is not about Flint's right to change the benefits under the contract. It's about Flint's right to change the contract, right? Well, they certainly changed the health care, and to the extent that the health care was frozen in the contract specific amount, they were changing it. But if you get into the facts and look at the contracts, you would find that, one, the and coverages that are much less than the coverage that the employees are currently getting. Well, let me ask you this question. Was that litigated below? Is this . . . we're just trying to find out whether we can proceed with this case under the assumption that what's at issue is Flint's . . . well, first of all, it's not even the ultimate question, but the injunction was issued in the context of the question whether Flint could change what the contracts otherwise provided for under the authority of the emergency manager, as opposed to whether this really doesn't violate the contract. Well, I think that the issue is whether or not the City of Flint could change what coverage they had at the time the emergency manager came in, what was being provided to them . . . Right. By virtue of what? By virtue of authority within the contract to change that, or by virtue of the emergency manager? Well, by virtue of the Emergency Manager Act, he chose that route to change the language. They did have a certain coverage that was being provided to them, and he did change that coverage to make it the same as all active employees had. When we evaluate likelihood of success on the merits, we shouldn't be looking at the terms of the contract, right? We should be looking at the authority under the Emergency Manager Act and the constitutional standards for changing a contract, if we find it's legislative. I think that that's correct. Okay. So, in fact, you do have a city that was in a dire financial situation. He did exercise that right and modified the contract. I would point out to you, though, that what we're really talking about here is . . . and while the appellees don't say it directly . . . is the retirees are really saying they have 2013 coverage, but they want the cost to be related to what it was in 1985 or 1990, whenever they retired. Because they don't have the same coverage that they had when they retired, so when they make this argument that we want the health care coverage we had when we retired, they don't have that. So, it's been changed from time to time after they retired. Is that the case? That's correct. And how was that accomplished? I mean, was that accomplished because there was something in the contract that allowed it or something in the retirement book that they got or . . . how did that come about? I think that mostly came about by changes in the federal law as to what was required to be covered in a policy and what insurance companies were providing at various points in time. And you had to change because, one, the product you started out with was no longer available or . . . I can understand that. So, the source of authority there was some change in federal law. Were there any other changes that weren't mandated by some change in federal law? I don't know that there were any changes that weren't either mandated by federal law or by product available by insurance companies. Okay. So, but at some point, what they were getting turned out to be more than what the active employees were getting. Is that your point? Yes. Okay. Yes. I've got it. It definitely was. So, I think that Judge Tarnow, even if we assume for purposes of this argument that the emergency manager was exercising a legislative function at the time that he made this decision to make this change and, therefore, the constitutional provision about impairment of contracts could be triggered, that he certainly . . . the changes he made certainly were justified and reasonable in light of the public interest of trying to divert bankruptcies and financial ruin of cities. Well, the retirees argue, I think, that there's no evidence in the record that the city was contemplating bankruptcy. That's one of the stated reasons for these modifications. And they also argue, as I recall, that there were so many other options and alternatives that the city did not consider, whether it be issuing bonds or other . . . retiring the debt over a longer period of time, that there were other options and alternatives available to the city. So . . . Well, the trial court speculated as to some things, but I don't think there's any evidence in the record where there was evidence put in that there were other alternatives. For example . . . No. What I'm saying is I think that the retirees argue . . . I don't know what evidence there is in the record. I don't think there . . . But I think that they argue that there would be other options available to the city. And maybe your response is there's nothing in the record to show that there were any. That would be my first response, that there's nothing in the record that shows there are any other responses, nor is there anything in the record that supported the three things that the trial judge kind of glommed onto is, like, you could increase water and sewer rates and come up with money. Well, first of all, that would be illegal. Water and sewer funds are collected based upon a fee basis, not a tax, and those water and sewer funds must be used for a water and sewer system. They couldn't be diverted to the general fund and used to pay health care benefits. So . . . Is the water system totally self-sufficient? I think it is with the rate increase that they did at the beginning of this fiscal year that's at issue. So there's not general fund money being used for that. I think he also said, well, you could just increase the millage. Well, the general fund millage, there's a limit on that, and they were almost to the limit on what they could collect on that. So as far as putting a millage . . . First of all, you have to put it before the citizens and get them to approve it. You can't just create additional millage. And secondly, they were at the . . . close to the statutory limit of millage they could do. But again, there was no record to establish that that really was a viable option. Let me ask one more question, if I could. I know your time is expiring. But I know the manager argues or takes the position that these modifications were temporary in nature. Yes. Does that impact how we look at this case and the contract clause implications? Definitely it does. Because under the case law, under the contract clause provision, that even if you are impairing a contract, it's not automatically a violation of the constitutional provision. And one of the elements to look at is whether or not it's a permanent impairment or whether it's a temporary impairment. And in this case, this particular impairment expires on June 30, 2014. But there's nothing that prohibits the manager from renewing or extending the modification? Well, he would have to go through the process under the statute to do that if he chose to do that at that time, which now under PA 436 requires the involvement of the city council and a process if they disagree with that. So yes, that's a possibility. But the current impairment that we're talking about now will expire. OK. I see your time has expired. Why don't we give you an extra three minutes and your opposing counsel an extra three minutes? Because we've asked you a lot of questions. OK. I think the trial judge also erred when he speculated that there would be some irreparable harm to the plaintiffs in this case who didn't testify, one, that they had any specific health care that they were entitled to and really didn't identify any specific harm. And he basically, the trial judge, basically said that, well, they could have some medical treatment possibly that they- But they were going to lose some money out of their pockets, weren't they? Yes. They definitely are going to lose some. They definitely are going to have to contribute more out of their pocket than they were previously. All right. I did have a question for you. I don't want to get you off your four-factor outline there. But I'm wondering what's happened in the Pontiac case. Where are we with that? Are you talking about the appeal that was before this court? Yeah. It's back down in the district court. Is that correct? No. We have filed an application for en banc review of that case. Oh, okay. So it's pending. And there has been a letter from the court here directing the plaintiffs to reply to that application. So I don't know where it's going to go from there. All right. And then another question. Is this the only one of these emergency manager cases that you're handling? What I'm interested in knowing is, do we know how many municipalities in Michigan actually have an emergency manager at this point? Well, I'm involved in the Pontiac one also. All right. City of Hamtramck has an emergency manager just recently, which we are doing some work for. Detroit does. Detroit has an emergency manager. And they, of course, have filed bankruptcy. Right. They've taken that route. There is an emergency manager in Benton Harbor, the city of Benton Harbor. There are a few school districts that also have emergency managers. Okay. It's the ones I can think of at the moment. Is this the institution of the emergency manager thing, is this unique to Michigan? Do you know? You know, I'm not sure about that. What other states may have a similar situation. Okay. Thank you. And then I think the trial judge also erred in his decision that there was no potential harm to the public by issuing an injunction when really the only evidence in the record was what we placed in the record through the testimony of the emergency manager and the financial manager of the city, excuse me, the emergency manager and then the financial director, I guess it is, which indicated that all these other cuts that have been done and where they were going to have to come up with this $3.5 million if they couldn't use it to reduce health care was in the police and fire department. And this is a city that the record has evidence for you that is the number one crime per capita in the United States. Why didn't you have to balance the budget in one year? Well, I mean, again, the judge trial judge is trying to substitute his discretion for that of the emergency manager, but there's been deficits and all we're doing and has been done is you're kicking the can down a road and you're making the problem bigger. And he decided, well, one, because he's required under the emergency manager act and there's another state law that says you have to balance your budgets if you're a municipality and they have put you under a plan if you don't and you have a limited time to fix that. And they had exhausted that already from previous fiscal years. And the problem you get into is, okay, so you, if you can, you borrow some money, your delay payment, and in the next year's budget is even worse off and you're worse off and pretty soon, and this is a case that I know a little bit better in Pontiac, you end up where you're debt servicing so much money that you can't pay for the needs of the citizens for public safety and other things. Well, we're not talking about a huge sum there. Let me, let me ask you a question. Let's say the, the city had some large obligations for services rendered and, you know, they owe somebody $4 million. Can they just say, well, look, I mean, this is for the good of the city. We are not going to, we are going to pay everybody half. They pull out the six biggest accounts payable that they have or, you know, accounts do, and they tell everybody, we're really sorry, but we're going to cut your payment in half. Can they do that? Can the emergency manager do that? I'm not sure whether Chapter 9 of the Federal Bankruptcy Code allows the creditors to move into bankruptcy as a municipality, if you didn't pay them. I'm not proposing bankruptcy. No, I'm proposing, I'm suggesting to you, and I'm not sure, I know in Chapter 11 and 7, it's true that if you don't pay your creditor and you have at least three creditors and they can file an application for the bankruptcy. So if that's true with Chapter 9, then you could face a problem where the creditors would take the alternative of trying to run the city under emergency manager away from the city. So you're saying you could. Well, you could and pick up the lawsuits and or the filings of bankruptcy. No, I'm asking you, is this, would that be permissible under the contracts clause and everything else, would the fact that they have the option of going to bankruptcy court, is it permissible under the contract clause to pick six contracts and say we're only paying you half because this is necessary for our solvency? Well, you would still owe the, if you were going to terminate them completely and say, okay, we're only going to pay you half, we're never going to pay you the other half, then that probably would be a violation of the contract impairment provision of the constitution. If the emergency manager had the authority to do that, in my view, because it's certainly not temporary. You are saying we're going to wipe out completely your obligation. If you recall the, the early cases on the contract clause provision involved the mortgage environment in the thirties. Um, when the legislatures were taking actions to, to delay foreclosures of mortgage, they weren't, they weren't passing laws that were saying you don't owe the mortgage anymore. They were passing laws that would delay the foreclosure and give other avenues for the, uh, the debtor to pay that over a greater period of time. So I think if, if your example is that we just say we're not going to pay the other half, uh, that would one be create a cause of action for a breach of contract. And two, if we were arguing that the emergency manager could do that, then we probably would be violation of the contract impairments provision. So you're saying what saves this is that, that they're going to pay them back a year later, or they're just going to. Well, we're continuing to, what saves that is we are continuing to provide healthcare coverage. We didn't say no more healthcare coverage. So we are providing healthcare coverage. We modified it. And what we believe to be a reasonable way, considering the light of all the, the involved, and it is temporary. So if the emergency manager doesn't try to do something in June of 2014, coverage is going to have to revert back to what it was before. Okay. Thank you. Your time is expired. Thank you very much. We'll have your full rebuttal. Good afternoon. May it please the court. Um, the plaintiffs and appellees in this matter are municipal retirees who were promised a lifetime health insurance coverage as a result, not only of collective bargaining agreements that have not been disputed until we reached, uh, the appeal level, but also as a result of ordinances and pervasive past practices of providing these benefits, um, that resulted in mutually explicit understandings that this would be in place indefinitely. Um, for those that did not have the contractual, uh, coverage, what happened in this case is that the state of Michigan passed the new, uh, emergency manager act in known as public act four in 2011 and Flint was ultimately placed in receivership under the act in the very end of 2011, I think it was November. Um, over 90 days after the end of that legislative session, these orders were issued that purported to modify the contractual obligations owed to retirees, as well as changes that were being made to, um, current contracts and actives. The conflict here stems from those April 25th modifications and changes and really the, uh, plaintiffs. When we say reductions, I think that the defendants argue that the retirees will be able to obtain comparable, uh, healthcare coverage, or at least coverage that's comparable to that of current employees. Um, I don't know if that's in the record or not. I just recall saying that somewhere in the briefing and that in fact, the receive even better, uh, coverage, uh, than they would have under these old, uh, uh, collective bargaining agreements and ordinances. Uh, no, that is not, that's not the case. No. Um, these are cost shifting measures to push the costs of the coverage onto retirees, as opposed to, um, the city's obligations that have existed, uh, for the last few decades. Part of the question though, was what's happened to the active employees? Some of the cost has been pushed onto them too. Is that not the case? Some of the active input? Well, the actives of course, uh, for their health insurance coverage, the state came in and passed a new law that requires certain coverage levels and requires certain contribution levels for actives and they exempted retirees from those provisions. So actives had that change as well as some changes that were made by the emergency manager. Um, but those, those actives are under different contracts, of course. Um, there are, I'm just trying to find out if everybody's suffering. That's, um, I mean, the world at large seems to be suffering since midnight last night. I'm just trying to find out where Flint is in all of this. Um, there is, there, there have been changes that have been made to the actives. Um, I don't believe that they're the same plans that apply to the retirees because I think that there was a universe of three plans that were provided for actives, but certainly changes have been made to actives as well. Just not the subject of this. So the retirees plan, um, is not, it's, it exists as a contract separate and apart from any collective bargaining agreement, or was it some clause in a past collective bargaining? I mean, they're not under the retirees are no longer under a collective bargaining agreement. That's true. But the contractual obligation was created under past, uh, collective bargaining agreements and the obligation survives the, um, the, the expiration. Okay. And just out of curiosity, what did, what did the original agreement that I gather you want to continue to enforce, what did it say about modifications in the future? It didn't provide for any, any ability to modify the coverage. Um, it, it, I don't think contemplated any reductions in coverage at the time because there was no reason to believe that that would be an issue. Um, it simply, uh, specified that there was a certain level of coverage that was in place and it provided for that coverage. And that's why the changes came as such a surprise. Okay. And what, how old is that contract? When did that come into existence? Well, these, the contracts that provided for, um, the benefits at issue, uh, for example, some of the plaintiffs retired in, uh, the 1980s, um, these contracts that contained roughly the same language up through the, um, most recent, it was really around 2008 and after that the contracts began to change substantially for actives. These contracts are not in the record, are they? Um, no, they are not. Um, they are asking questions about language and contracts. And when I don't know if we need these as part of the record, maybe there's, you've agreed to what these contracts provide. It's more than one, right? I mean, it's a series of selective bargaining agreements that have changed over time. Yes. The, the contracts at issue, there was no dispute that the contracts existed initially, and it wasn't a contested issue, which is why I don't think that they were introduced the record below. Even the April 25th orders, when you review them, it's very clear that they acknowledge the existence of these contracts and the coverage levels. Well, you know, I have to say, we don't want to stop you and take up a lot of your time, but we get into these ERISA cases all the time where that's the whole, um, that's the whole dispute. And so I think we're almost brainwashed into wanting to know, you know, what this, what this background is. So you continue on with your, um, with your presentation. I just, I'm wondering about things like, I have to tell you though, I mean, one of the changes was apparently that the retiree, the covered retiree spouse would no longer be covered if he or she was covered under some other medical plan, which doesn't seem altogether unreasonable to me. And then there was the, uh, there was the, uh, requirement that they sign up for Medicare if they were old enough to, uh, qualify for Medicare. Is that, is that correct? Many of those, um, well, there were, there were additional, uh, provisions that were in, but, but I, for many of the contracts that was actually a requirement before that, that when they received Medicare coverage, they had supplementary coverage. It's just a change now in the kind of supplementary coverage that's provided. Because the government certainly looked me in the eye at 65 and said, go sign up. I mean, uh, and get off our backs. Um, and then what was the third one? Uh, the deductible, deductibles and copayments and, um, the providers that are willing to accept the coverage. And this is where we get into the real irreparable harm that was created as a result of these modifications. We've, we, the plaintiffs have testified that, for example, one of them had to forgo a physician that he was, that he had been seeing for 30 years because the physician no longer, um, you realize how many physicians are going out of plans these days? Um, that, that's one of the problems though. You, we don't, nobody any longer can say, I, I want to keep my own physician at your expense. Um, so give me another one. I'm afraid I'm not terribly, I think that said, I want my own doctor and I'd like to keep her forever, but I can't, I can't, uh, demand that the government allow me to do that if she goes out of plan or the plan changes. But it wasn't, of course, just that there's also the fact that, um, the stress tests that were used to monitor, for example, Mr. Welch's heart conditions could no longer be covered under the plan. So he would have, he'd had a heart attack in 1996, multiple surgeries following that, and now the benefit doesn't cover the monitoring of those. More, more to the point, I think for most of the retirees, the shifting cost is substantial and we're talking about over a thousand percent here. And it interrupt because they're on fixed incomes, it forces them to choose between basic necessities like paying their mortgages, um, you know, or food and securing health insurance coverage. And that's really the, um, source of the irreparable harm here. So you're suggesting to me that most of these people are not old enough to qualify for Medicare. I mean, the stress tests for the heart attack seem like something that Medicare would cover. Under the coverage that he was being shifted into. Some of them are, there are, there are post-Medicare retirees and they're pre-Medicare retirees. Both, both have. They're both kinds. Okay. That answers my question. Yeah. Um, there's, there are both kinds of retirees. Um, and for, for all of them, this, they had retired anticipating a certain level of pension benefits, certain level of income, and a certain level of healthcare coverage, and that was promised in the collective bargaining agreements where nobody really disputed, disputed that, um, and then that changed. Uh, I also wanted to address some of the, um, some of the arguments that I had, I had, uh, seen, uh, in the amicus brief. I didn't have an opportunity to respond to that. It was filed, I think, uh, last Wednesday. Um, but one of the, uh, one of the, uh, arguments contained within it was that there was no reference to the ordinance. Um, the ordinance, of course, that's a legal question. And I have the citation to the ordinance. Uh, it's the Flint Code of Ordinances, chapter 35, article four, section 81. And it lays out the, uh, health insurance coverage that non-collective bargaining agreement retirees were entitled to receive. Um, with respect to the period of time that these changes are in effect, there is actually nothing in these orders that creates a time limit. Um, that is, as far as I know, concocted out of thin air, there's nothing on the record to suggest that. The collective bargaining agreements that cover the actives are only for two year periods. That's where the two years comes from. The changes to the retiree benefits are indefinite. Would it make a difference? Well, yes. Uh, certainly I think that, that indefinite changes, um, weigh far more in favor of, of finding an impairment that's substantial than truly temporary changes, although I think that in any case, a two year change when we're talking about retiree benefits is still substantial impairment, but I do want to point out that they, there is no time period, there's no end period. And, and, uh, these orders and perhaps even more importantly, the orders themselves contemplate the city being able to come in and make changes in the future after the receivership period ends. And what we have here is really an attempt to secure the ability to this level of coverage into the future. Well, you know, the city makes the point though, that, um, you know, they've at least per the record, they have, uh, looked at all kinds of options, I guess, in terms of, uh, reducing the deficit and they're really pretty much down now to the police and fire department. And do you lay off 115 public safety officers who are deemed to be essential, necessary? Uh, or do you look at, uh, cutting, you know, retiree health benefits, increasing costs that it's pretty much down to that. I mean, the city is deep in the hole and can't pay everybody. That is the argument that the city has made. Um, it's an argument that the district court rejected. It had record evidence before it that showed that the city refused to consider revenue generating options altogether. I mean, it was not a question of, did they consider and evaluate and weigh options? Um, it was just, we won't consider those. We're cutting it. We're cutting this, uh, coverage and that's how we're going to impose the balance. Would a lesser change be okay? I mean, are you saying that no change to these benefits would be? Well, it would, I think it depends in large part on what the change is, right? It's a qualitative analysis, qualitative and quantitative analysis, but it really varies based on, um, what the change is. These changes are significant changes designed to shift costs onto retirees. Um, it's possible to imagine that there might be changes that didn't shift those kinds of costs under retirees, but still resulted in cost savings that didn't create the kind of irreparable harm we're talking about here that were acceptable. What's clear though, oh no, there was no attempt to negotiate or approaching, uh, there's a retiree association that's plaintiff in this case that the city of Flint has recognized. Um, they did not approach them. They approached the active unions who under Michigan law don't have any authority to negotiate changes. And was there changed the result of negotiation? Um, I don't believe so. I, I believe that it was a result of a unilateral change that was made, which is something that the emergency manager law authorized. Well, would you, I mean, as I understand it, you've got, you had very, very favorable, uh, retirement benefits in terms of healthcare by ordinance and under existing law, they could make changes, but it would have to be comparable benefits. Um, so now they, they clearly come in. It's a good way to save money. They, they want to change everything. Um, and you folks are sort of singled out. Um, but balancing that against the needs of the city, it would seem that if everybody's pulling in their belt a little, maybe it would be reasonable for you folks to do it too. So I just want to get back to this with the Medicare. Um, are there people who, well, let's talk about the spouses. So if a spouse has insurance or had an opportunity for insurance, but didn't take it because it costs money under this system, the spouse would now have to take it and pay the money or not? I believe so. Yes. If they have alternative coverage available, they have to take it under the April 25th orders. Um, before there were, there were contracts that provided, um, some contracts that were later that provided, if there was comparable insurance, um, that covered them, that they would have an obligation to take it. Um, it wasn't, didn't apply to all contracts, but these kinds of changes, um, were simply in this case, unilaterally imposed, and this applies as far as I can see. Okay. Are there people that are being compelled to buy the Medicaid supplemental coverage that did not have to buy it before? Yes. And who would those people be? They were the police and fire, uh, were required to do that. And they were, did not. So before, what did they have instead before? Um, they had a coverage plan that, that provided the same level or the same kind of coverage that that would, that the, um, supplementary coverage would have provided and they were, uh, they were not required to purchase it. Okay. So basically, so they're saying now you go purchase that coverage. You can get it from the federal government. We're going to carve that out of what we give. Uh, yes. Yes. That was, that was, as I understand it, that was the, um, that was the change that was made then that there's a, yes, I guess there was a cost shift there. I mean, are you sure? Cause you seem really, I, you know, I, I would have to review the record. My understanding is yes, they were not required to, I know that they were not required to purchase that before and now the plan does require them to purchase it. Um, so that, that's certainly the case. And how much is that? Uh, that I do not know offhand. Um, go council says it's about 50 bucks per person, um, per month. Okay. So that's not the big, that's not the thing that's breaking them. No, no. I think that the costs that are the most significant are going to be the Um, some of the other litigation goes, the prescription drug increases as well. Okay. And then I just have one more question. Now, why do you say that they have the discretion not to balance the budget? They've been operating deficits from 2007, 2008, 2009. Um, the deficit, uh, the existence of the deficit itself is not prohibited. Um, what they are concerned primarily as it goes to their, to their options, they didn't consider any other kind of revenue generation. And they actually had a plan that this is part of the record. They had a plan that didn't involve borrowing. Now they're nowhere near their cap on borrowing. I think that they're, they're using about 11 million out of 95 million that's available. So you dispute what counsel said? Yes. Yes. Um, and that plan that was, that was not even considered simply rejected would have involved no abrogation of any contractual, um, rights whatsoever. But it would have produced more debt in the long run. Well, in the long run, it would have actually resulted in a balanced budget. Um, it wouldn't have produced the same results in the immediate short term that this did, but of course our position is that they're not simply allowed to have obligations on par with other policy choices. And that's consistent with the. Well, let me just tell you what my concern is, Mr. Gibbs. And that is, you know, we're getting very close here to having the court step in and make policy decisions, uh, requiring the spouses to do something else is reasonable, but, uh, upping the copay is not reasonable. Uh, cutting the benefits for the retirees is not reasonable, but cutting this over here is reasonable and, um, that those are really the kind of decisions. Maybe we do have the wisdom of Solomon and we should be making them, but frankly, we don't want to, and we need to be kind of careful in these cases that we don't invite the, you know, six different municipalities in Michigan to come in and let us do the negotiating that apparently didn't happen. That's all. Fully pulpit, uh, speech for the day. And just to address that point, the, the court in Toledo makes this, your job is to evaluate whether there's a substantial impairment, whether it was reasonable and necessary under the circumstances. And that's where looking at the alternatives is, is the, that's how that factors into the analysis. And here the district court was able to take a look at what was done. And there were factors that cast significant doubt on the credibility of the, um, city's witnesses that were being considered here. They had taken measures that were inconsistent with their purported, um, plans, and there was documentary evidence on the record that suggested that they were not actually motivated by, by the purposes that they were advancing. So the court, courts don't simply, um, shield, you know, wave their hands and say, there's nothing that we can do. Otherwise the contracts clause would have no teeth whatsoever. Mr. Gibbs, your time has expired. Appreciate your argument and we'll hear a rebuttal from Mr. Hitchcock. Just a few points. Um, I would agree with them that the order of the emergency manager did not have the time limit on it. But if you look at the treasury's department's approval, which is part of the process, um, that did, it said, I'm approving you doing this through June 30th, 2014. I think you'll find that in the amicus brief filed by the attorney general, where they, they identify that there's a limitation on it also. So it's my opinion that, that as I indicated before, the emergency manager is going to have to start all over if he wants to go beyond that date. And I have to go through that whole process of input from everybody before he could change it. Um, the, the Medicare issue, I think I can answer that for you. There's a Medicare part A that everybody is automatically covered by when you turn 65, that doesn't cost you any out of pocket. And there's a Medicare part B that, uh, requires you to make the monthly payment to have that. Um, there were a number of retirees who had not signed up for Medicare part B, and that was part of the order to require them if they were Medicare part B, which means that the wraparound coverage that the city has is less at that point in time, because there's more covered by the federal government under Medicare by doing that. So they were asked to do that. Did the city look at, uh, ways to increase revenue? Does the record reflect that the retirees seem to argue that the city did not, uh, explore revenue generating opportunities? I mean, I'm not sure what those, what those are. I mean, we have the income tax week and we can't control how much everybody's earning to pay that. We have the property tax that unfortunately was declining through this recession, um, and we had the state revenue sharing, which state of Michigan had reduced all municipalities and it's the revenue sharing it was paying, uh, based upon its own financial problems during the recessionary time period. Um, we, you can possibly go to the voters and ask for a specific millage for retiree healthcare. We did that in the city of Pontiac. And what happened? They rejected it by about two thirds or three fourths vote. I think almost somewhere between those two numbers, they rejected it. They didn't want to pay any additional millage to support retiree healthcare. So you mentioned that the city could have done these things or possibly could have done them. Does the record reflect whether the city did engage in any of this analysis? I don't think that there was questions asked about that particular, those particular points. Um, that's why I say, I think if you look at the records, you see that the judges coming up with, with speculative ideas of alternatives, but without any record that would say they were even viable. And my mind, although I would admit that the city didn't put it out to the citizens, that from my experience, it, it wouldn't have been a viable option because the citizens feel they're already feel they're overburdened in taxes and would have rejected it. No, I mean, it really depends upon how you put it to them. If you put it to them as here's a special millage to pay the retirees, everybody's going to say, no, but if you look at your budget and you say, we have a contractual obligation to pay the retirees, let's put out a millage to maintain police and fire, people may look at it differently. Well, it wouldn't be to maintain police and fire services. It would be to maintain retiree healthcare. If you, if you give them that proposal. No, but why, why would you, how do you decide what the millage is for? You have to describe the purpose of the millage in the language at the ballot so that the people can voting can read it and say, okay, I'm voting for. I know. I'm asking you a question. How do you decide that the extra money is for the retirees as opposed to we need more money to do something, to meet a different obligation? Well, we already have a police and fire millage for operation of police and fire. Okay. We could have tried to raise that. And that, that was, that, that was on the last ballot. And what happened? They, they voted for that. Okay. So you could have gone back and tried to raise it a little bit more. Okay. Thank you. Thank you, counsel for your argument. You didn't ask your question. You didn't ask your question. Oh, that's great. Um, thank you very much for your arguments today. We really appreciate them. Um, I know we took up a little extra time, uh, but, uh, hopefully it was, it was beneficial to everyone. Uh, the case will be submitted.